The **BORDEN COMPANY**, Petitioner,

v.

**FEDERAL TRADE COMMISSION**,
Respondent.

No. 14622.

United States Court of Appeals
Seventh Circuit.

Dec. 28, 1964.

Stuart S. Ball, H. Blair White, and Thomas E. Kauper, Chicago, Ill., Cecil I. Crouse, Edwin Clark Davis, New York City, Joseph A. Greaves and Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel, for petitioner.

J. B. Truly, Asst. Gen. Counsel, Gerald J. Thain, Attorney, Federal Trade Commission, Washington, D. C., for respondent.

Before DUFFY and KILEY, Circuit Judges, and MAJOR, Senior Judge.

DUFFY, Circuit Judge.

In April 1959, the Federal Trade Commission (Commission) issued a complaint alleging petitioner, The Borden Company (Borden), violated Section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), by selling fluid milk in interstate commerce at different prices in eleven different communities (area price discrimination), and at different prices within ten communities (local price discrimination).

Borden produces, manufactures, processes and markets a wide range of products including dairy products. In 1958, Borden had milk businesses in twenty-nine states. As of September 1, 1959, Borden operated eighty-one milk processing plants and milk routes in more than five hundred counties. The operation of the eighty-one plants was under the general jurisdiction of ten supervisory units each headed by a district chairman. Due to the highly localized nature of the milk business, the district chairmen, in most cases, delegated "broad managerial responsibility" to local plant managers including responsibility for determining prices.

At the various hearings before the Commission, evidence was received with respect to varying prices for milk in sixty-five communities in eight states. A specification of charges was filed to narrow the issues. Area price discrimination charges were confined to seventeen communities in Texas, New Mexico,

Arkansas, Louisiana, Indiana, Michigan, Ohio and Kentucky. The local price discrimination charges were confined to "sales to grocery store consumers in Portsmouth and New Boston, Ohio, by its Portsmouth, Ohio plant." The charges were further limited to sales to grocers of milk in half-gallon and gallon containers.

To avoid extensive hearings to present Borden's defenses, eight lengthy stipulations were filed on March 9, 1962, at a hearing in Washington, D. C.

On October 8, 1962, the Trial Examiner filed his Initial Decision. He found Borden's prices in Portsmouth and New Boston did not violate the Act since all milk involved "was produced, processed and sold in Ohio" and that none of the purchases involved were "in commerce" as is required by the Act. The Examiner found, however, that Borden had unlawfully discriminated between non-competing grocer customers located in Elkhart, South Bend, and Walkerton, Indiana, and Sturgis, Michigan.

Borden petitioned for a review of the Initial Decision relating to area price discrimination charges. Commission counsel petitioned for review relating to local price discrimination charges. Thus, the issues were narrowed to the charges of area price discrimination involving South Bend, Elkhart, Walkerton, and Sturgis, and local price discrimination in Portsmouth and New Boston, Ohio, being a total of six of the approximately sixty-five communities named in the evidence.

The Federal Trade Commission has five members. Only three took any part in the Commission's decision and order in this case. Commissioner Dixon wrote the opinion.[1] Commissioner Elman vigorously dissented. Commissioner Anderson "concurred in the result," without any statement of reasons.

It is obvious that Commissioner Anderson did not agree with all that was said in the opinion written by Commissioner Dixon, yet, it is "the findings and con-

1. Although the Dixon opinion does refer to New Boston, the finding of a local price discrimination is limited to Portsmouth, Ohio.

clusions" embodied in the Dixon opinion which are necessary to support the final order.

The only finding of a local price discrimination violation relates to Borden's prices in Portsmouth, Ohio. The Examiner found that Borden's sales to customers in Portsmouth were made from Borden's Portsmouth plant and that the milk sold was processed by the Portsmouth plant from raw milk produced and purchased in Ohio. These findings are not disputed.

■ Section 2(a) of the Act forbids the seller "to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce." The words "in commerce" mean in interstate commerce. The Supreme Court, in Standard Oil Company v. Federal Trade Commission, 340 U.S. 231, 236–237, 71 S.Ct. 240, 243, 95 L.Ed. 239, said: "In order for the sales here involved to come under the Clayton Act, as amended by the Robinson-Patman Act, they must have been made in interstate commerce."

The Court, in Willard Dairy Corp. v. National Dairy Products Corp., 6 Cir., 309 F.2d 943, 946, said: " * * * [I]t is not enough under the Clayton Act, as amended by the Robinson-Patman Act, that the defendant be engaged in interstate commerce but it must also be shown that the sale complained of was one occurring in interstate commerce."

Commissioner Dixon placed great stress on the fact that Borden is engaged in interstate commerce. He described Borden as "an interstate corporation"; that its operations constitute an "interstate complex" and that its practices and policies have an "interstate homogeneity."

■ The view of Commissioner Dixon on this point is summed up in his opinion when he said: "Since it is impossible to divorce The Borden Company and its products, if The Borden Company is in commerce, so must be all its products." We disagree.

■ We find ourselves in complete accord with Commissioner Elman where he discusses what we may designate as the "Portsmouth charge." He said: "Section 2(a) of the Clayton Act, as amended, states the jurisdictional requirement respecting 'commerce' in three separate ways, and each of these variants of the commerce requirement must be satisfied. First, respondent must be 'engaged in commerce'; second, the unlawful discrimination must occur 'in the course of such commerce'; third, 'either or any of the purchases involved in such discriminations' must be 'in commerce.'" Commissioner Elman cites the decision of this Court in Central Ice Cream Co. v. Golden Rod Ice Cream Co., 7 Cir., 287 F.2d 265.

Commissioner Elman continued— "However, unless the third commerce requirement of Section 2(a) is to be given no effect whatever, the Commission's burden of establishing jurisdiction cannot be discharged merely by a showing that respondent is an interstate concern or that it makes interstate sales not involved in the challenged discrimination."

Commissioner Elman also stated— "The language and scheme of Section 2 (a) make plain that not all transactions by interstate businesses are subject to the statute, and what legislative history there is on the question supports this view."

As Commissioner Elman points out, the alleged discriminatory sales from Borden's Portsmouth plant seem clearly local in nature and without significant interstate incidents.

It is undisputed that the sales of milk were negotiated in Ohio, the milk was produced, processed and delivered in Ohio for resale in Ohio.

■ Insofar as the order of the Commission may be based upon the sales of milk at Portsmouth, Ohio, the order cannot be sustained.

### SALES AT WALKERTON

In 1958, Walkerton, Indiana, had a population of about 2500. It had four grocery stores and one dairy store.

Borden's sole grocer customer in Walkerton was an A & P store. Another grocery, Nick's Supermarket, had five times the sales volume of the A & P store, and was the dominant grocery in Walkerton.

James Burger's creamery and dairy stores processed milk at New Paris, Indiana, and sold it under the label "Burger" through thirty-five Burger stores. Burger opened a dairy store in Walkerton in November 1957, and featured gallon jugs of milk at prices substantially below the prevailing out-of-store price for two half-gallons of milk.

Samuel and Tom Frame did business in Walkerton and other communities under the name of Quality Dairy (Quality). Quality purchased Borden plant milk from Borden's Hammond, Indiana, plant and also other milk from South Bend which was likewise sold under the "Quality" brand. Also, Borden used Quality as its agent to deliver Borden's milk to the A & P store. A distributor from Dean Milk Company (Dean) sold Dean milk to grocers and also a distributor for Hillview Dairy operated in Walkerton.

Out-of-store milk prices began to fall in November 1957 due to the opening of the Burger store. On November 27, Burger advertised an out-of-store price of sixty cents for a gallon jug of milk. This price was fourteen cents to twenty-four cents per gallon below the prevailing price for a gallon of milk in half-gallon containers. On January 9, 1958, Nick's ran a newspaper advertisement offering Dean and Quality milk at twenty-five cents per half gallon. A & P met this price. Borden, on January 10, reduced its price to A & P from thirty-two and three tenths cents to twenty-two and two tenths cents per half-gallon, and made a corresponding reduction to Quality.

On January 16, Nick advertised that for one week, with every five dollar purchase at its store, a customer could buy a half-gallon of milk for ten cents. Samuel Frame notified Borden of this fact. Borden then reduced its price to nine and two tenths cents per half gallon, and reduced its price to Quality to make it possible for Quality to resell to its grocery customers at ten cents for a half-gallon out-of-store price. On January 23, Borden increased its wholesale price to thirty-five and one tenth cents per half-gallon.

Commissioner Dixon's opinion found there was not sufficient evidence to support the Examiner's findings with respect to injury to competition in South Bend, Elkhart and Sturgis, but did find that Borden's prices in Walkerton, Indiana, during the one week commencing January 16, 1958, violated the Act.

The Act makes price differentials unlawful only if the effect may be a) "substantially to lessen competition," or b) to "tend to create a monopoly in any line of commerce," or c) "to injure, destroy, or prevent competition * * *."

It often has been pointed out that differences in price without competitive injury are not illegal. Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, 550, 80 S.Ct. 1267, 4 L.Ed.2d 1385. Unless the adverse competitive effect may be "substantial" as required by the language of the Act, the Commission's burden has not been met. Whitaker Cable Corp. v. Federal Trade Commission, 7 Cir., 239 F.2d 253, 256, cert. den. 353 U.S. 938, 77 S.Ct. 813, 1 L.Ed. 2d 761. In Whitaker, we said 239 F.2d at page 256:

> "Congress has not outlawed price differentials per se, unjustified though they may be. The Act was not intended to reach every remote, adverse effect on competition. The effect must be substantial. (Citing cases) * * * If the discrimination complained of does not, cannot, and will not have the defined effect of injury to or substantial lessening of competition, or tendency to create a monopoly, the Act has not been violated and the Commission is without authority to prohibit such discrimination. (Citing case) This is implicit in the very language employed by the Act. Any other construction would turn the Act into a price con-

trol law contrary to its manifest purpose. * * * "

In American Oil Company v. Federal Trade Commission, 7 Cir., 325 F.2d 101, 104, we also stated that "Price discrimination does not per se constitute a violation of Section 2(a)."

In determining the minimum evidence to establish a probable substantial injury to competition, the Courts have consistently distinguished between cases involving "primary-line" injury which is injury to competition between the seller and his direct competitors, and "secondary-line" injury which is injury to competition between the customers of the seller. The Walkerton incident did not involve any charge of injury to competition between Borden's customers.

The Commission cites and relies on Federal Trade Commission v. Morton Salt Company, 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196. However, the Morton Salt rule is wholly inapplicable in cases of area price discrimination where a primary-line injury is a requirement. Furthermore, we think the Supreme Court has limited what it said in Morton Salt to cases involving injury to competition between purchasers as distinguished from cases involving competition between sellers. Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, 552, 80 S.Ct. 1267, n. 21.

The fact that the Walkerton incident involved nothing more than a one-week reduction in a community of 2500 people made in response to price cutting by the largest grocer, and never repeated, quite clearly indicates that the temporary price reduction during that one week could not have had a substantial adverse effect on competition.

In this connection, it is important to keep in mind the distinction between injury to competitors and injury to competition. See Rowe, Price Discrimination Under the Robinson-Patman Act, 130 (1962); Balian Ice Cream Co. v. Arden Farms Co., 9 Cir., 231 F.2d 356, 368.

In American Oil Company v. Federal Trade Commission, 7 Cir., 325 F.2d 101, a secondary-line case, American reduced prices during a price war to four customer-dealers in Smyrna, Georgia, for a period of seventeen days. The price war began when another major supplier reduced its pump price to meet the price of a station in Smyrna selling unbranded gasoline. This Court set aside the Commission's order and directed dismissal of the complaint, at least, in part, on the ground that "such relatively minor and temporary loss of business" was not substantial within the meaning of the Act. In that opinion we stated, at page 106: " * * * [T]here must be something more than an essentially temporary minimal impact on competition * * *."

The only competitors alleged to be injured by Borden's one week price reduction were Dean and Quality.

We fully agree with the analysis made by Commissioner Elman in his dissenting opinion. We do not think that respondent's week of below-cost selling which was done to meet the "loss leader" conduct of a retailer selling a rival brand, indicates a course of conduct calculated to injure rivals and harm competition generally.

In this case, the Commission has labored mightily and brought forth a mouse. It started out making rigid inquiries and close examination as to Borden's price practices as to fluid milk in some sixty-five different communities. When the matter reached us, only two of those instances were left for consideration. As we have heretofore indicated, the Portsmouth transaction could not be relied on without amending the Act by judicial construction amounting to judicial legislation. As to the Walkerton matter, it is clear to us that there is no basis for Commissioner Dixon's findings and conclusions.

The order of the Federal Trade Commission dated February 7, 1964, will be vacated and set aside in its entirety.