486 F.2d 763
 1973-2 Trade Cases 74,719
 MAYER PAVING AND ASPHALT COMPANY, an Illinois corporation,
and Lee O. Mayer, sole surviving partner of Mayer Paving
Company, a co-partnership, Plaintiffs and
Counter-Defendants, Appellants and Cross-Appellees,
v.
GENERAL DYNAMICS CORPORATION, a Delaware corporation and
Material Service Corporation, a Delaware
corporation, Defendants and
Counter-Claimant, Appellees
and Cross-Appellants.
 Nos. 72-1613, 72-1703, 72-1704.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 25, 1973.
Decided Oct. 1, 1973.
Certiorari Denied Jan. 14, 1974.
See 94 S.Ct. 899.
 
 John J. Borst, Jr., Francis J. McConnell, Chicago, Ill., for Mayer Paving & Asphalt Co.
 James R. Thompson, U. S. Atty., William T. Huyck, Asst. U. S. Atty., Patrick W. O'Brien, Bertram M. Long, James W. Gladden, Jr., and Ronald W. Szwajkowski, Chicago, Ill., for Gen. Dynamics Corp.; Mayer, Brown & Platt, Chicago, Ill., of counsel.
 Before CLARK, Associate Justice,* and PELL and SPRECHER, Circuit Judges.
 PELL, Circuit Judge.
 
 
 1
 Mayer Paving and Asphalt Company and Lee O. Mayer appealed from a judgment in favor of Material Service Corporation, a subsidiary of General Dynamics Corporation, on its counterclaim and from a judgment n. o. v. in favor of defendants on plaintiffs' complaint.** Plaintiffs alleged that they had been the victims of illegal price discrimination in the sale by General Dynamics of crushed limestone which plaintiffs used in their paving business. The price discrimination was charged to be a violation of Sec. 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, Sec. 1, 49 Stat. 1526, 15 U.S.C. Sec. 13(a).[1] General Dynamics Corporation's subsidiary, Material Service, counterclaimed for foreclosure of a mortgage and for the balance due on a promissory note and open account, most of which arose out of the course of dealing between Mayer Paving and General Dynamics. On this appeal, Mayer Paving raises two principal issues: first, the propriety of the district court's grant of judgment n. o. v., and second, the jurisdiction of the district court to enter a judgment against plaintiffs on Material Service's counterclaim.
 
 
 2
 Lee O. Mayer and her husband, Sidney R. Mayer, Sr., operated Mayer Paving Company as a partnership until the latter's death in October 1964. Thereafter, the business was incorporated as Mayer Paving and Asphalt Company. The plaintiffs will hereinafter be referred to collectively as Mayer Paving. Mayer Paving engaged in the asphalt paving business at all material times and had its principal place of business in Skokie, Illinois. Material Service Corporation was originally organized to produce and distribute crushed limestone, sand, and other aggregates in the paving and construction business. On December 31, 1959, General Dynamics Corporation acquired the assets of Material Service Corporation through a statutory merger. Thereafter Material Service was operated as a division, Material Service Division, until it was reincorporated as a wholly-owned subsidiary in March 1969.
 
 
 3
 Material Service operates five quarries in the Chicago area and sells to paving and construction contractors in Indiana and Illinois. Mayor Paving alleged and the jury from its verdict apparently concluded that during all relevant times[2] Material Service was guilty of charging Mayer Paving higher prices for stone than it charged Mayer Paving's competitors. The jury was unpersuaded by Material Service's evidence concerning the cost and other claimed justifications of the various price differences.
 
 
 4
 Following the entry of judgment on the jury's verdict, General Dynamics and Material Service moved for judgment n. o. v. on the ground that Mayer Paving had not established the jurisdictional prerequisite for a Robinson-Patman Act suit. The district court granted the motion in a memorandum opinion dated June 9, 1972. The court based its decision on its opinion that the factual situation here involved fell within the ambit of Borden Company v. Federal Trade Commission, 339 F.2d 953 (7th Cir. 1964), rather than Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954). The district court concluded that Borden held that the Robinson-Patman Act did not cover a customer's action for price discriminations when all of the properly challengeable sales were intrastate.
 
 
 5
 Section 2(a) of the Clayton Act, as amended, requires three different types of "in commerce" (i.e., interstate commerce) tests to be satisfied before jurisdiction can be established: first, the discriminator must be "in commerce"; second, the challenged discrimination must occur "in the course of such commerce"; and third, "either or any of the purchases involved in such discrimination are in commerce. . . ." "The first two elements of the statutory 'commerce' provision are of lesser import . . . . Of prime decisional significance . . . is the test that the challenged discriminatory transaction must itself occur 'in' commerce. Under that test, the applicability of Robinson-Patman is determined by this rule of thumb: at least one of the two transactions which, when compared, generate a discrimination must cross a state line." Rowe, Price Discrimination Under the Robinson-Patman Act (1962), Sec. 4.9, at 78-79. Such is the case in the present controversy as defendant does not challenge that it is itself "in commerce" and that the discrimination may have occurred in the course of commerce. The parties are deadlocked on whether or not the third "commerce" requirement has been met. Mayer Paving may not avail itself of the seemingly applicable language of Sec. 3 of the Robinson-Patman Act, 15 U.S.C. Sec. 13a, since that section provides no private right of action. Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 967 (1958).
 
 
 6
 Mayer Paving contends in reliance upon Moore that, since Material Service sold to a number of firms in Indiana at prices lower than those given Mayer Paving, the third commerce requirement has been satisfied: ". . . once having established discrimination in commerce within the meaning of Sec. 2(a), proof of competitive injury is sufficiently demonstrated when it is shown that Mayer Paving and other Illinois contractors are consistently charged substantially higher stone prices than their local competitors as well as Indiana contractors."
 
 
 7
 General Dynamics, on the other hand, contends that in a case of secondline discrimination, that is, one in which the customers of the discriminator sue for damages to competitive position, such as is alleged by Mayer Paving, one of the discriminatory sales which is "in commerce" must be either to the plaintiff or to a competitor of the plaintiff. "That MS [Material Service] may have made interstate sales to Indiana contractors is irrelevant.2a Those Indiana contractors did not compete with Mayer, nor did the southern Cook County contractors who did small amounts of business in Indiana. . . . Therefore, this case only involves sales by MS of crushed limestone produced in Illinois to Mayer and its competitors for use in Illinois." We are thus presented with a pure question of statutory interpretation.[3]
 
 
 8
 Initially, we should note that the scope of the Robinson-Patman Act amendments to the Clayton Act is significantly different from the Sherman Act's in this very requirement that one sale be "in commerce." Lehrman v. Gulf Oil Corp., 464 F.2d 26, 36 (5th Cir. 1972), cert. denied, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665; A. Cherney Disposal Co. v. Chicago & Suburban Refuse Disposal Association, 484 F.2d 751 (7th Cir., filed June 28, 1973) (p. 755). In contrast to the specific requirements of the Robinson-Patman Act, "it appears settled that only those activities are beyond the reach of the Sherman Act which are 'purely local' in the double sense that they (1) are not within the flow of interstate commerce and (2) have no significant effect on that flow." ABA, Antitrust Developments 1955-1968, 39 (1968). Thus, we do not presently need to consider whether Congress has the power to reach such discriminations as are alleged by Mayer Paving. What we must determine is whether Congress intended to reach such discriminations.
 
 
 9
 "The Robinson-Patman Act as a whole was the product of such a complex series of interrelated legislative proposals that congressional intent is unusually difficult to decipher." Recent Cases, 86 Harv.L.Rev. 765, 769 (1973). This is particularly true of the phrase requiring one of the sales to be "in commerce." Compare Rowe, Discriminatory Sales of Commodities in Commerce: Jurisdictional Criteria Under the Robinson-Patman Act, 67 Yale L.J. 1155, 1166 n. 46 (1958), with Recent Cases, supra, 86 Harv.L.Rev. at 769-771.
 
 
 10
 We agree with the district court's appraisal that the decision of this appeal is dependent upon whether the situation involved activates the guidelines of Moore or of Borden. Unfortunately, neither is factually squarely in point and ultimately we must determine what the congressional intent was with regard to the precise factual situation before us, in what we regard as a case of first impression. Nevertheless, because of their general pronouncements on the subject, we first turn to a consideration of Moore and Borden.
 
 
 11
 Certainly, the touchstone for analysis in the present area is Justice Douglas's opinion for a unanimous Supreme Court in Moore. In that case, Moore was engaged in the bakery business in Santa Rosa, New Mexico, with none of its activities being in interstate commerce. The defendant was a corporation in competition with Moore for the local business in New Mexico. In addition to its intrastate business, the defendant was engaged in interstate commerce in that it sold bread in Farwell, Texas, with a truck originating in New Mexico. The plaintiff and the defendant became engaged in a price war in Santa Rosa, New Mexico, during which the defendant cut its price in Santa Rosa while holding its prices up in all other areas in which it was doing business, including its interstate business in Farwell, Texas. The Court held that such activity contravened the Clayton Act, as amended, even though the direct injury was purely intrastate. Mayer Paving relies heavily on the observation in Moore relating to the use of a treasury drawn from interstate business to finance impermissible local competition, 348 U.S. at 119, 75 S.Ct. 148; compare Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203, 209 (5th Cir. 1969), and Willard Dairy Corp. v. National Dairy Products Corp., 309 F.2d 943 (6th Cir. 1962), cert. denied, 373 U.S. 934, 83 S.Ct. 1554, 10 L.Ed.2d 691 (1963), with Littlejohn v. Shell Oil Co., 456 F.2d 225, 229 (5th Cir. 1972), petition for rehearing en banc granted, 470 F.2d 997 (5th Cir. 1973).3a But that issue is not really involved in the present case since Moore was a case of primary-line injury, injury to a competitor of the discriminator, and the present case involved secondary-line injury, injury to one of the customers of the discriminator. That distinction is well-established, Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, 542-544, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960), and it has substantial impact on the disposition of the present case. See also Rowe, Price Discrimination, supra.
 
 
 12
 Borden Company v. Federal Trade Commission, supra, which the district court below found to be controlling in the present case, while factually distinguishable is analogous to the present case. In Borden, this court refused to enforce the Commission's order because the alleged discriminatory sales from Borden's Portsmouth plant were without interstate indicia. "It [was] undisputed that the sales of milk were negotiated in Ohio, the milk was produced, processed and delivered in Ohio for resale in Ohio." 339 F.2d at 955. There is no suggestion that the Portsmouth plant sold any of its products in interstate commerce. It is that fact which, as Mayer Paving notes, distinguishes Borden from the present case. It scarcely needs stating that the Borden Company was extensively engaged in interstate commerce. That is also true, although to a lesser extent, of both General Dynamics and Mead's Fine Bread in the Moore case, the latter defendant being one of several corporations having interlocking ownership and management in the same family. The pattern for growth of monopoly found by the Court in the situation in Moore, a primary-line injury, does not exist in this secondary-line injury case. In the case of the secondary-line injury of the present type,[4] we are persuaded that the interstate character of General Dynamics' overall business is not a controlling factor any more than it was in Borden.
 
 
 13
 However, General Dynamics did sell interstate from its Illinois operations and, as noted, the factual situation differs in this respect from Borden. Similarly, other cases cited by defendant are distinguishable either as involving allegations of purely intrastate sales, e. g., Belliston v. Texaco, Inc., 455 F.2d 175 (10th Cir. 1972), cert. denied, 408 U.S. 928, 93 S.Ct. 306, 34 L.E.2d 264, and Food Basket, Inc. v. Albertson's Inc., 383 F.2d 785 (10th Cir. 1967), or relying on the "flow of commerce" doctrine in which the court found that the goods had come to rest, e. g., Cliff Food Stores, Inc. v. Kroger, Inc., supra, and Walker Oil Co. v. Hudson Oil Co. of Missouri, 414 F.2d 588 (5th Cir. 1969), cert. denied, 396 U.S. 1042, 90 S.Ct. 684, 24 L.Ed.2d 686 (1970), a doctrine which was inferentially undercut in Mr. Justice Clark's opinion for this court in Bargain Car Wash, Inc. v. Standard Oil Co. (Indiana), 466 F.2d 1163, 1166 (7th Cir. 1972).
 
 
 14
 In turning then for our decision to the wording of the statute we are reminded of Mr. Justice Frankfurter's appraisal that "precision of expression is not an outstanding characteristic of the Robinson-Patman Act." Automatic Canteen Company v. Federal Trade Commission, 346 U.S. 61, 65, 73 S.Ct. 1017, 1020, 97 L.Ed. 1454 (1953). We shall also attempt to follow his admonition in the same case "to confine ourselves as much as possible to what is in dispute here." For our present purposes, that which is in dispute is whether there is a violation of the Act where all of the purchases in which price discrimination existed made by both Mayer Paving and its competitors were intrastate and therefore not "in commerce."
 
 
 15
 For the resolution of the particular dispute we again examine the words of the statute: "where either or any of the purchases involved in such discrimination are in commerce . . . ." It is our view that the word "involved" when read against the underlying purpose of the anti-trust laws, to protect competition, requires that only the purchases by Mayer Paving competitors and by Mayer Paving itself be considered in determining whether "either or any" discriminatory sale is "in commerce." We are fortified in this conclusion by the fact that Sec. 2(a) specifies that a price discrimination is actionable only "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ." Only those purchases which might injure competition are "involved" under the Robinson-Patman Act.
 
 
 16
 Mayer Paving attempts to argue applicability of Moore by variations of the factual situation here involved. We are not concerned with other factual situations but only the one here involved and whether it calls into play the sanctions of the Robinson-Patman Act. Essentially, we have in the particular situation an analogue to standing. The customer has standing only to raise and compare those sales which are injurious to his competition. Cf. Federal Trade Commission v. Anheuser-Busch, Inc., supra, 363 U.S. at 342-343, 80 S.Ct. 1267. The competitor of the seller, on the other hand, has more freedom under Moore since the Court has declared that the competitor of the seller is involved in any sale which may be used to finance an intrastate price war in violation of the provisions of the Robinson-Patman Act. The analytical distinction involving the "competing customer" is discussed in Rowe, Price Discrimination, supra at 80. Similarly, the requirement that some evidence of competition exist to justify the invocation of this section of the Act is also found in National Lead Co. v. Federal Trade Commission, 227 F.2d 825, 836 (7th Cir. 1955), rev'd on other grounds, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957). "For to the extent customers on different sides of a boundary line do not compete with each other, no adverse competitive effects on the customer level can ensue from the supplier's price variations." Rowe, Price Discrimination, supra at 179.
 
 
 17
 We do not find plaintiffs' reliance on Littlejohn v. Shell Oil Co., supra, persuasive. That case involved what one commentator has called "indirect primary-line competition," Case Comment, 57 Minn.L.Rev. 1035, 1040 n. 26 (1973). The court was concerned with the "underwriting" theory found in the general language in Moore, discussed above. Here, there is no allegation that the buyers who allegedly received lower, non-justified prices were related to General Dynamics in any way similar to the manner in which the gasoline stations were related to Shell Oil and American Oil in the Littlejohn case.
 
 
 18
 Once we so limit the referent of "purchases involved," the clear language of the statute requires us to affirm the judgment n. o. v. for defendant since on this appeal Mayer Paving has not contended that any of the sales to its competitors or itself were "in commerce."[5]
 
 
 19
 Mayer Paving also challenges the jurisdiction of the district court to enter judgment on the counterclaim. Mayer Paving in its original complaint named only General Dynamics Corporation as a defendant. In its answer, General Dynamics included a counterclaim on behalf of Material Service Corporation. After it filed a reply to the counterclaim, Mayer Paving moved for summary judgment or dismissal of the counterclaim on the ground that Material Service Corporation was not a party to the action. Following some procedural haggling, the district court[6] in a memorandum opinion dated May 7, 1971, ordered Material Service Corporation joined as a party pursuant to Rule 19(a)(2)(i), Fed.R.Civ.P., and denied Mayer Paving's motion for summary judgment on the basis that the counterclaim arose out of the transaction or occurrence that was the subject matter of the complaint and was compulsory pursuant to Rule 13(a), Fed.R.Civ.P., thus relieving Material Service from the necessity of establishing independent jurisdictional grounds.
 
 
 20
 General Dynamics referred to this problem as "a quibble as to terminology-a misnomer-which the previous attorneys for the plaintiffs and the attorneys for the defendant had not deemed of sufficient importance to correct by amendment of the complaint to add Material Service Corporation as a formal defendant." We do not view it as such, although some of the alleged discrimination went back to a time when Material Service, as a separate corporation, was the sole seller to Mayer Paving. Without any assertion of its relation to the complaint save for a vague reference as "Material Service Division of General Dynamics, now Material Service Corporation," various counterclaims were asserted by an entity never named in the complaint and never otherwise made a party to the cause. Defendant in its brief argues that any defect was waived by plaintiffs' failure to object or otherwise raise the issue in its reply to the counterclaim, analogizing it to the waiver of the defense of lack of jurisdiction over the person found in Rule 12(h)(1), Fed.R.Civ.P. But that analogy is inapposite. Lack of subject matter jurisdiction is not waivable and must be raised by the court on its own motion, Rule 12(h)(3), Fed.R.Civ.P.
 
 
 21
 We turn then to the ground upon which the district court relied, that Material Service Corporation should be joined as a party under Rule 19(a)(2)(i) since the disposition of the action "in its absence may as a practical matter impair its ability to protect [its] interest." The general policy of Rule 19, as with the Federal Rules of Civil Procedure in general, is "the impulse . . . toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." United Mine Workers of America v. Gibbs, 383 U.S. 715, 724, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966) (footnote omitted).
 
 
 22
 Under the Rule, Material Service Corporation would seem to be an interested party. The disposition of the action may collaterally affect its rights since it is the successor to the alleged principal violator of the law, Material Service Division. Thus, Material Service Corporation is arguably suitable for joinder under Rule 19(a)(2)(i). The only question is does it meet the general requirement of Rule 19(a) that "joinder will not deprive the court of jurisdiction over the subject matter of the action." Thus, joinder may be inappropriate if it destroys diversity of citizenship. Jurisdiction in the present case is founded upon 28 U.S.C. Sec. 1337, which gives the district courts original jurisdiction to hear cases arising under Acts of Congress "regulating commerce or protecting trade and commerce against restraints and monopolies." Normally, this jurisdictional basis would be lacking since the present Material Service Corporation did not come into existence until after the date at which Mayer Paving stopped making the purchases alleged in the complaint. If we construe the assumption of the assets and liabilities[7] of the former Material Service Division of General Dynamics by Material Service Corporation as carrying over and giving Mayer Paving a right of action against the new corporation for the old division's alleged violation of the antitrust laws, then we have a suitable jurisdictional basis for the joinder.
 
 
 23
 Once we can determine that Material Service Corporation was properly joined as a party defendant, it is clear that the counterclaim was properly within the jurisdiction of the district court. A compulsory counterclaim under Rule 13(a), Fed.R.Civ.P., "may be interposed without meeting jurisdictional requirements because it is auxiliary to the original action. . . ." Chance v. Country Board of School Trustees of McHenry County, Ill., 332 F.2d 971, 973 (7th Cir. 1964). Since the counterclaim for the unpaid stone arises out of the transactions that are the subject matter of the complaint, the counterclaim is compulsory and there was no need for any independent jurisdictional basis. G & M Tire Co. v. Dunlop Tire & Rubber Corp., 36 F.R.D. 440, 441 (N.D.Miss. 1964).
 
 
 24
 However, we need not rest our decision solely on the foregoing analysis supporting joinder of Material Service Corporation as a defendant. Disregarding form for substance, the court could have treated the motion as a motion under Rule 14(a), Fed.R.Civ.P., to implead Material Service Corporation as a third-party defendant. Had counsel for defendant in terms chosen this possibly preferable course the entire matter would have been considerably simplified. On the facts of this case, especially after our review of the pleadings and briefs, it would seem that the third-party complaint was what was really involved since General Dynamics was in effect saying that its new subsidiary, Material Service Corporation, had assumed all of the liabilities of the old Material Service Division and was, therefore, liable over to it for any violations of the Robinson-Patman Act committed by Material Service Division.
 
 
 25
 The sixth sentence of Rule 14(a) then provides the basis for Material Service Corporation's claim against Mayer Paving: "The third-party defendant may also assert any claim against the plaintiff arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the thirdparty plaintiff." The courts have split on the question of whether separate subject matter jurisdiction must be shown to sustain the third-party defendant's claim against the plaintiff. See 6 Wright & Miller, Federal Practice and Procedure: Civil Sec. 1458, at 311 n. 69 and Sec. 1444, at 229-234, esp. nn. 90 & 91. Even the commentators are in disagreement. Wright and Miller favor ancillary jurisdiction in this type of claim, 6 Wright & Miller, supra, Sec. 1444, at 234, and Moore indicates that it is inappropriate, 3, Moore, Federal Practice p 14.27 (2d ed.). We are persuaded that the better theory is to allow the claim to be brought under the ancillary jurisdiction power, especially since here the claim would have been a compulsory counterclaim subject to ancillary jurisdiction if the successor corporation had been originally named as a defendant. We agree with and adopt the reasoning of Circuit Judge Morgan in Revere Copper & Brass Inc. v. Aetna Casualty and Surety Co., 426 F.2d 709 (5th Cir. 1970), where this same question was analyzed and answered in favor of ancillary jurisdiction.
 
 
 26
 Thus, we affirm the district court's jurisdiction of the counterclaim on the alternative grounds that Material Service Corporation was properly joined as a defendant or that it was properly made a third-party defendant.
 
 
 27
 For the reasons given hereinbefore, the judgment of the district court is affirmed.
 
 
 28
 Affirmed.
 
 Mr. Justice CLARK (dissenting):
 
 29
 This is the first dissent that I have filed in my several sittings with this Circuit, and it is, therefore, with regret that I find myself in disagreement here. However, the appellant, Mayer Paving and Asphalt Company, has been deprived of a $498,204.00 verdict and judgment by the granting of a motion non obstante veredicto, and, in my judgment, the sole ground for such precipitous action is entirely unsupportable. Indeed, if finally sustained, it will operate as a repealer of Section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. Sec. 13(a) (1970), and will severely restrict the holding in Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954).
 
 
 30
 1. I say the ground upon which the motion non obstante veredicto was granted is unsupportable because the learned trial judge misapplied the holding of this court in Borden Company v. FTC, 339 F.2d 953 (7th Cir. 1964). As I read it, Borden is not apposite. In it the Federal Trade Commission indulged itself in a non sequitur, i. e., that since Borden was in interstate commerce, it necessarily followed that all of its products were also in interstate commerce. This Circuit, I submit, correctly held that Borden's being in interstate commerce was not enough; "it must also be shown that the sale complained of was one occurring in interstate commerce." 339 F.2d 953, 955. In Borden, there was a complete absence of interstate sales from any of its plants in Ohio and no connection whatever between its local sales in Ohio and its interstate sales. The reversal was based entirely on these facts. 339 F.2d 953, 955.
 
 
 31
 2. Here exactly the opposite is shown by the record. Mayer's claim and proof were based on the shipments of crushed limestone by General Dynamics[1] from Illinois at discriminatory prices during 1958-1968 to asphalt manufacturers and paving contractors in Illinois and Indiana. The sales were made from five quarries of General Dynamics-all located in Illinois-and one of which was only a few miles from the Indiana border.[2] It was the closest source of crushed limestone for operators located in Indiana, especially East Chicago, Hammond, Gary and other nearby cities. A sales office for this quarry was located in LaPorte, Indiana, and a distribution yard at Gary. The record also shows that four Indiana paving contractors purchased over $4.5 million of crushed limestone and other products from General Dynamics which were shipped from its quarries in Illinois during the decade involved in the suit. As the trial judge found, there were "substantial sales of like goods" made by General Dynamics from Illinois quarries to Indiana customers; and the 1968 total sales of General Dynamics were some $29 million which were divided among customers in the two states.
 
 
 32
 Mayer's purchases from General Dynamics during the decade involved ran $5.4 million alone. This large volume, it was claimed, resulted from a requirements contract[3] required in a credit or loan agreement between General Dynamics and Mayer obligating the latter for a five-year period to purchase 80 percent of its total limestone, etc., requirements from General Dynamics. Although the contract provided for the payment of "current market prices" on all orders, the proof revealed that Mayer was charged from 10 cents to 47 cents more per ton than favored customers of General Dynamics. Among its favored customers were the four Indiana operators mentioned, one of whom (A. Metz Inc.) competed with Mayer. Metz paid from 20 cents to 23 cents per ton less than General Dynamics charged Mayer, while Walsh and Kelly's (at Griffith, Indiana) price from General Dynamics ran as much as 30 cents less than Mayer's. There were also several General Dynamics' favored customers in competition with Mayer located in Illinois. For example, the Skokie Valley Asphalt Company (Des Plaines, Illinois) regularly paid between 32 cents to 47 cents less per ton during the damage period for crushed stone supplied by General Dynamics than Mayer was charged. Both the Indiana and Illinois price discriminations were uncontradicted at the trial and were clearly deleterious to genuine business competition.
 
 
 33
 It appears to me that a plain reading of Sec. 2(a) prohibits such discrimination. It provides that if "either or any of the purchases involved in such discrimination are in commerce" then all are prohibited. The majority interprets the all-inclusive phrase "either or any" to apply to sales to Mayer only insofar as the presence of commerce is concerned. Mead's Fine Bread holds the opposite. Here the allegation and proof, uncontradicted, are that some local sales (from the same Illinois quarries) in Illinois as well as interstate ones to Indiana customers were at much lower prices than like sales to Mayer and other Illinois customers. I always thought that this was a practice that Sec. 2(a) was specifically intended to prohibit. Here, while the quarry involved was only a few miles from Indiana, still Illinois customers were charged more for like material than were Indiana ones, without respect to delivery costs, etc. General Dynamics answers that Mayer was not a competitor in Indiana. Although this is not strictly true since it did compete somewhat unsuccessfully with A. Metz Inc., still Mayer was prevented from effectively competing across the border in Indiana because of the higher charges exacted from it. After preventing it from competing, General Dynamics now says that Mayer is deprived of the protections of Sec. 2(a) because he did not compete. Such an interpretation transposes Sec. 2(a) into a tool of discrimination rather than a protection. The result is that interstate competition is lessened and Mayer is destroyed.
 
 
 34
 3. Strangely enough, the majority relies on the old and honored doctrine of standing to deprive Mayer of its jury verdict and judgment. The majority says: "The customer has standing only to raise and compare those sales which are injurious to his competition." Mayer does not compete in Indiana, it finds. Under the circumstances here this conclusion which the majority says is critical to its decision is a non sequitur. This record shows that General Dynamics sold all of the four Indiana operators involved in the discriminatory activity at such a lower rate per ton than it sold Mayer that the latter could not compete with them in Indiana. The record also shows that Mayer tried to compete in Indiana with A. Metz but failed. Indeed on one job there Mayer was obliged to sublet and buy the necessary material from a supplier other than General Dynamics. Finally, the record clearly shows that General Dynamics' action prevented Mayer and other Illinois asphalt manufacturers and paving contractors from competing in Indiana by its discriminatory pricing to favored customers. To hold that Mayer had no standing to sue in such a factual situation is to repudiate the mandate of Congress in Sec. 2(a) and creates a barrier that in the final analysis will operate as a repealer of this important section of the Act insofar as discrimination among customers of the same seller is concerned. The intent of the Congress in this regard is clearly stated by Congressman Utterback, manager of the bill in the House:
 
 
 35
 "Where, however, a manufacturer sells to customers both within the State and beyond the State, he may not favor either to the disadvantage of the other; he may not use the privilege of interstate commerce to the injury of his local trade, nor may he favor his local trade to the injury of his interstate trade . . ." 80 Cong.Rec. 9417. (Emphasis supplied).
 
 
 36
 4. The majority also adopts the argument of General Dynamics that Moore v. Mead's Fine Bread Co., supra, is inapposite because it involved primary competition between Moore and Mead. I find nothing in Sec. 2(a) that limits its coverage to primary competition cases. On the contrary, the Act's purpose was to prevent all discriminatory pricing "where the effect of such discrimination may be substantially to lessen competition . . ." That interstate competition was substantially lessened in the particular geographical situation involved here is without peradventure; that the discriminatory pricing, in the words of Sec. 2(a) "injured, destroyed or prevented" Mayer from competing with "customers" of General Dynamics located in Indiana was found to be true by the jury and was embodied in the judgment entered by the court and now set aside. Section 2(a) says nothing about "primary" or "secondary" lines of competition. Its intent, as stated by its manager, Congressman Utterback, was to condemn all discriminatory pricing "injuring" interstate commerce. To distinguish this case on technical differences between primary and secondary competition is but an arbitrary distinction entirely without a difference on these facts. Rather than excepting from Sec. 2(a) the customers of the seller-as the majority does unless they are competing with one another-for the purposes of determining the presence of interstate commerce-Sec. 2(a) specifically includes them and in the peculiar factual situation here requires, insofar as commerce is concerned, no proof of existing competition among the customers of the same seller. When it comes to the assessment of damages, competition might be crucial. While the factual situation was different in Mead's Fine Bread, where the interstate operation afforded a treasury for destroying local competition, the thrust of Mead's Fine Bread also covers this case. Indeed, in Mead it was admitted that the Act covered situations where "interstate commerce is in some other way used to destroy competition or is injured or impaired as a result of unlawful acts." 348 U.S. 115, 119, 75 S.Ct. 148, 150. Here interstate commerce was used and unlawful acts were perpetrated in a continuous pattern for over ten years in sales made in interstate commerce that not only lessened competition but injured, destroyed or prevented Mayer from competing.[4]
 
 
 37
 5. General Dynamics makes no further attack on the judgment other than the sufficiency of the proof of damages and its asserted good faith effort to meet competition. There is no evidence in the record supporting the latter claim that would grant General Dynamics forgiveness under the Act. The proof on damages appears, as the jury found, quite sufficient under the decided cases and should not be disturbed.
 
 
 38
 6. This case was submitted to a jury after three weeks of testimony. No point is made of any error in the instructions or the theory upon which the case was submitted, other than the jurisdictional point as to the existence of interstate commerce about which I have spoken. I find that it has no merit.
 
 
 39
 The Seventh Amendment provides that "no fact tried by a jury, shall otherwise be re-examined in any Court of the United States," U.S.Const. amend. VII. As I see it the verdict of this jury should not have been "re-examined" and overturned nor the judgment set aside. It is late enough now to correct this mistake. The original judgment should be reinstated.[5]
 
 
 
 *
 Associate Justice Tom C. Clark, United States Supreme Court, Retired, is sitting by designation
 
 
 **
 While this cause was on appeal, Lee O. Mayer died and Continental Illinois National Bank & Trust Company of Chicago, as administrator of the estate of Lee O. Mayer, deceased, was substituted in her place
 
 
 [1]
 15 U.S.C. Sec. 13 provides in pertinent parts: "(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ."
 
 
 [2]
 The district court ruled that only the period within the four year statute of limitations, i. e., subsequent to August 29, 1965, would be considered, as Mayer Paving had failed to establish fraudulent concealment. Because of the conclusion we have reached on the scope of the Act, we do not find it necessary to consider this point
 2a This apparent concession by General Dynamics is obviously of an arguendo nature for it is footnoted in the brief as follows: "Actually, since the Indiana contractors picked up their stone at MS's Thornton [sic] Quarry, it is hard to see how even those sales can be 'in commerce."' Noting that this factual assertion was not denied in Mayer's reply brief, we agree that the sales to Indiana contractors, as to whom Mayer did not claim any status of competition or even potential competition, were not sales "in commerce." The sales transactions completed at the quarries, all of which were in the state of Illinois, were clearly intrastate sales.
 
 
 [3]
 Mayer Paving has not argued in this court that its activities in Indiana, which might be characterized as de minimis, brings it into competition with Indiana contractors. At trial, counsel for defendants established on cross-examination that Mayer Paving's Indiana contracts barely involved purchases from Material Service, with most of the work being sublet
 Further, Mayer Paving does not rely in this court on the fact that one of its competitors, Rock Road Construction Co., Des Plaines, Illinois, did work in Wisconsin, Illinois, Iowa, and Indiana, since it was established that Mayer Paving was not a competitor of Rock Road on any of its out-of-state work.
 3a Subsequent to the time that the drafting of this opinion was completed and the opinion had been circulated, this court learned that the Fifth Circuit, en banc, had vacated the earlier panel opinion insofar as it indicated a lack of necessity for at least one discriminatory interstate sale. 483 F.2d 1140 (5 Cir. 1973). In the present opinion, we had found Littlejohn as originally written not dispositive. The superseding en banc opinion, of course, strengthens the result reached by the opinion in the present case before this court. Since we have reached the result we did irrespective of the original Littlejohn opinion, we have not deemed it necessary to revise the references in our opinion to the original opinion nor to refer further to the en banc opinion other than noting that it supports the result we have reached.
 
 
 [4]
 As will be indicated later in this opinion, attention must be directed to the exact factual situation creating the issue for determination. Thus, it was stated that it is "too well known to require extensive exposition-that the 1936 Robinson-Patman amendments to the Clayton Act were motivated principally by congressional concern over the impact upon a secondary-line competition of the burgeoning of mammoth purchasers, notably chain stores." Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, 543-544, 80 S.Ct. 1267, 1271 (1960). The situation causing concern did show a pattern for the growth of monopoly where there was an impact directly upon competition and the injury was "commerce" related
 
 
 [5]
 Because of the result we have reached on this issue we find it unnecessary to consider Mayer Paving's arguments as to fraudulent concealment, statute of limitations, and recoupment. Similarly, we need not consider General Dynamics' cross-appeals as to the insufficiency of Mayer Paving's proof at trial
 
 
 [6]
 District Judge Bernard M. Decker, to whom the case was then assigned
 
 
 [7]
 The record is not entirely clear on the matter of assumption of liabilities although the liabilities frequently are travelling companions of the assets, which here were assumed. Nevertheless, the matter was not disputed by Mayer Paving
 
 
 [1]
 Throughout my dissent I have adopted the designation "General Dynamics" given by the majority to the appellees and cross-appellants. Originally the company was known as Material Service Corporation; General Dynamics Corporation obtained the assets of Material Service in 1959 and the latter was operated as a division of General Dynamics, known as Material Service Division. In 1969 the latter was re-incorporated as a wholly owned subsidiary
 
 
 [2]
 The five quarries were Riverside, Federal, Stearns, Romeo and Thornton. The latter was regarded as the largest commercial quarry in the world and is located a few miles from the Indiana border at the intersection of the Tri-State
 
 
 [3]
 The contract was dated April 15, 1957, and its original draft provided that Mayer would purchase all of its requirements from Material Service Corporation for the ensuing five years but the final draft was changed to 80 percent of Mayer's requirements. The consideration was a loan or line of credit for $300,000 made by Material Service Corporation. The validity of such an arrangement is suspect. See my opinion in Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc., 365 F.Supp. 235, U.S.Dist.Ct., N.Dist.Cal. (1972)
 
 
 [4]
 The majority also emphasizes that the "pattern for the growth of monopoly" found to be present in Mead's Fine Bread is nonexistent here. While this is true, we must remember that Sec. 2(a) was also specifically aimed at discriminations which may "substantially . . . lessen competition . . . or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them."
 
 
 [5]
 With reference to the counterclaim of General Dynamics, I agree with the majority that it should be affirmed