Jim BEAM and Bill Beam, Plaintiffs,

v.

MONSANTO COMPANY, INC., a corp., and Lion Oil Co., Defendants.

No. FS-71-C-82.

United States District Court,
W. D. Arkansas,
Fort Smith Division.

June 10, 1976.

Fines F. Batchelor, Jr., Van Buren, Ark., for plaintiffs.

H. Derrell Dickens, El Dorado, Ark., for Lion Oil.

William M. Stocks, Ft. Smith, Ark., for Monsanto.

OPINION

JOHN E. MILLER, Senior District Judge.

Each of the defendant corporations has filed a motion for summary judgment in accordance with Rule 56, Fed.R.Civ.P., seeking a dismissal of the complaint and amendments thereto. They seek judgment based upon the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits which they contend show that there is no genuine issue as to any material fact and that each moving party is entitled to a judgment as a matter of law. Because of the varied claims in support of their motions, it is necessary to consider the motions of the defendants separately and separate judgments will be entered.

The original complaint of plaintiffs, Jim Beam and Bill Beam, was filed December 6, 1971, against Monsanto Company, Inc., in which they alleged that for many years they were engaged in business, as partners, under the business name of Beam Brothers Contractors, said business primarily being general contracting and manufacture of asphalt concrete, at Fort Smith, and Prescott, Arkansas.[1]

That their primary business was construction, reconstruction, repair and resurfacing of highways under contracts with the Arkansas State Highway Department and Federal Highway Administration. As a part of that business, they purchased and operated primarily for their own use, an asphalt cement mixing plant, and did various other jobs of dirt moving, road building, and general work of similar nature and in laying asphalt cement; that approximately in May of 1966, plaintiffs started purchasing oil necessary for the manufacture of

1. On March 25, 1970, Monsanto filed a suit against Beam Brothers for balance on account for oil and related products purchased and used by them in mixing asphalt paving material at their plant at Ft. Smith, Ark., and later at Prescott, Ark. By amendment filed June 8, 1970, Monsanto alleged that Beam Brothers was indebted to it in the amount of $14,341.24 for merchandise and material furnished between March 19, 1969, and Sept. 30, 1969. The suit was based on Ark.Stat.Ann. §§ 70–301—70–307 (1957 Repl.). The lower court sustained a demurrer to the counterclaims of the Beams which were substantially the same as the allegations in their complaint and first amendment thereto now before this court, and sought recovery of same amount of damages as sought herein. The Supreme Court affirmed, 259 Ark. 253, 532 S.W.2d 175.

asphalt cement from defendant through its El Dorado, Arkansas plant, and were assured that they were buying such materials at as low a price as the same materials were being sold to any other individual, corporation or business when, in fact, the same was not true; that during the transacting of business, defendant was engaged in commerce and did directly and indirectly discriminate in price between different purchasers of commodities of like grade and quantity, and particularly these plaintiffs with said purchases involved in such discrimination in commerce were sold for use, consumption and resale within the United States, and particularly the State of Arkansas; that the effect of such discrimination was to substantially lessen competition and tend to create a monopoly and did further injure, destroy and prevent competition of these plaintiffs with others in like business. That plaintiffs were damaged in the amount of $15,000 by reason of direct overcharges for materials purchased, but in addition thereto were forced out of business, which resulted in their loss of all of their equipment and real estate involved in their operation, good will, and their entire business venture, has resulted not only in the loss of all amounts invested, but has also resulted in large judgments being obtained against them for merchandise and supplies purchased by them in attempting to operate said business, to their actual damage in the sum of $765,000. Plaintiffs pray for judgment for treble damages or $2,295,000.

On February 4, 1972, the answer of defendant Monsanto was filed along with a motion to dismiss for lack of jurisdiction. In its answer the defendant denied all allegations of damage and specifically stated that no price discrimination existed in violation of 15 U.S.C.A. § 13; that any discrimination, if any existed, did not substantially lessen competition or tend to create a monopoly in any line of commerce or to injure, destroy or prevent competition with any person.

### First Amended Complaint

On March 27, 1972, plaintiffs filed their first amendment to the complaint which merely elaborated upon the allegations of the original complaint as to the purchase by plaintiffs of material from the defendant Monsanto; that the plaintiffs started purchasing the oils necessary for the manufacture of asphalt cement from Monsanto in approximately April of 1965 (1966). Plaintiffs seek to recover the same sum of money by the first amendment to the complaint as in the original complaint.

On April 17, 1972, the defendant Monsanto filed its answer to the first amended complaint, in which it denied all allegations of damage and violation of the law as alleged by plaintiffs. It further alleged that the plaintiffs have knowingly alleged facts which they know to be false in a spurious effort to give this court jurisdiction of this cause; that plaintiffs have admitted under oath in this cause in oral depositions taken January 28, 1972, that no price discrimination existed; that all of the asphalt which the plaintiffs purchased from defendant during the years 1966, 1967, 1968 and 1969 was utilized within the State of Arkansas and purchased by them at El Dorado in the State of Arkansas.

### Second Amended Complaint

On March 22, 1974, plaintiffs filed a second amended complaint in which they made Lion Oil Company a defendant, and in effect repeated the former allegations of liability, and in addition thereto alleged that months after the defendant Monsanto had been served with interrogatories that the said Monsanto and the Lion Oil Company did conspire between themselves to have substantially all records concerning the transactions involved herein and the interrogatories served upon the said Monsanto Company, Inc., retained in the records of the said Lion Oil Company, the said Monsanto Company, Inc., disposing of, or purporting to have disposed of all of its stock in said corporation, and in furtherance thereof and in further efforts to prevent these plaintiffs from obtaining all records and information available which will clearly and undisputedly prove plaintiffs' allegations herein, said Monsanto Company, Inc.,

and Lion Oil Company did conspire to and have, to this date, prevented these plaintiffs from examining, receiving information concerning or having available such necessary records, all of which is a part of and a continuing conspiracy upon the part of said defendants to violate the United States Anti-Trust Laws, and particularly 15 U.S.C., paragraphs 1 through 15, inclusive, and to conceal such violation, and an attempt to prevent the proof of such violations and conspiracy by and between such corporations, to the detriment of, among others, and specifically these plaintiffs. Then follows the same allegations of damages heretofore referred to.

On April 4, 1974, the named defendant Lion filed its answer in which it denied each and every allegation and statement set forth in the second amended complaint insofar as any such allegation or statement has any reference, directly or indirectly, to defendant Lion and that the second amendment to the complaint should be dismissed.

In further answer Lion alleged that it was organized as a Delaware corporation on July 26, 1972; that it did not exist prior to said date; that it was organized by The Oil Shale Corporation, a Nevada corporation; that all of the capital stock of Lion Oil Company is now and has at all times since its organization been owned by The Oil Shale Corporation; that Monsanto has never owned any interest in Lion Oil Company either direct or indirect, or in whole or in part; and does not now and has not at any time since the organization of Lion Oil Company had any right of control of Lion Oil Company, nor has it attempted to exercise control or in any manner direct the activities of Lion Oil Company; that on November 1, 1972, Lion Oil Company purchased the oil refinery of Monsanto located at El Dorado, Arkansas, the pipelines related thereto, and the service stations and refined products marketing facilities of Monsanto; that Lion assumed no obligations, liabilities or responsibilities relating to such purchase arising, in whole or in part, prior to November 1, 1972.

It is further alleged:

"That Lion Oil Company has advised counsel for plaintiffs of all of the facts mentioned above; that Lion Oil Company has advised plaintiffs that Lion Oil Company has no objection to plaintiffs inspecting and copying material records in the possession of Lion Oil Company relating to plaintiffs' alleged cause of action against Monsanto Company pursuant to appropriate orders of this Court protecting the confidentiality of legitimate proprietary information of Lion Oil Company that may be contained in any such records and at the expense and cost of plaintiffs; that Lion Oil Company is an innocent and unrelated party to any differences or controversies between Monsanto Company and these plaintiffs; that these plaintiffs are abusing the processes of law in a vain and unwarranted effort to cause Lion Oil Company to do a substantial amount of work at Lion Oil Company's expense with respect to a matter in which Lion Oil Company has no obligation or interest."

The plaintiffs, Jim Beam and Bill Beam, are citizens of Arkansas and reside in the Western District. The defendant Monsanto Company, Inc., is a corporation incorporated under the laws of the State of Delaware and is authorized to do business in Arkansas. The defendant Lion Oil Company is a corporation organized and existing under the laws of the State of Delaware and is authorized to do business in Arkansas. The amount involved herein exceeds the sum of $10,000, exclusive of interest and costs, and thus jurisdiction is founded upon diversity and the amount involved. 28 U.S.C. § 1332.

The writer accepted assignment of this case on February 11, 1976, and on the same date issued an order for a pretrial conference on all the issues made by the pleadings. The court directed counsel for the parties to confer within seven days relative to any questions that they may desire to have determined at the pretrial conference that they were unable to reach an agreement thereon; that if the parties were unable to reach an agreement disposing of the

case, counsel were directed "to prepare, serve and file with the court summaries of the facts each party intends to prove and each legal proposition relied upon supported by citations," and that such summary should contain a descriptive list of exhibits to be offered at the trial of the case. Counsel were also admonished to be fully familiar with the provisions of Rule 16, Fed.R. C.P., and Rule 9 of the Rules of the U. S. District Court for the Eastern and Western Districts of Arkansas to the end that the order to be entered at the conclusion of the pretrial conference may govern further proceedings, if any.

The parties were unable to reach any agreement concerning any phase of the case. Plaintiffs insisted that the defendants had conspired to prevent plaintiffs from obtaining records and information available which will clearly and undisputedly prove plaintiffs' allegations in the pleadings, and in particular that the Lion Oil Company "did conspire to and have to this date prevented these plaintiffs from examining, receiving information concerning or having available such necessary records, all of which is a part of and a continuing conspiracy on the part of said defendants to violate the United States antitrust laws and particularly 15 U.S.C. §§ 1–12, inclusive, and to conceal such violation and in an attempt to prevent the proof of such violation and conspiracy by and between such corporations to the detriment of, among others, and specifically these plaintiffs."

Extensive discovery procedures have been pursued by the parties. The facts have been established as completely as possible, and there is no reason to delay decision of the issues as alleged in the pleadings.

The latest discovery procedures began on March 12, 1976, when plaintiffs served and filed requests for admissions of fact and genuineness of certain documents upon both Monsanto and Lion.

On March 26 Monsanto served and filed its answers and objections to the requested admissions and interrogatories and the materiality of the alleged documents. Later,

Lion filed its response and objections to the interrogatories and the alleged documents.

On April 1 plaintiffs filed motion to compel both defendants to respond to the interrogatories and requests and upon default that judgment or appropriate sanctions be imposed. On the same date the court overruled the motions of plaintiffs.

On May 3, 1976, after consideration of the motions of plaintiffs and the response and objections thereto of the defendants, the court entered an order overruling the motions.

In the meantime, on April 13, 1976, Monsanto filed its motion for summary judgment supported by brief, and on April 29 Lion filed its motion for summary judgment. On May 28 the plaintiffs filed their objections to the denial by the court on May 3 of discovery and admissions procedure. On the same date, May 28, plaintiffs also filed response to motions of defendants for summary judgment and for summary judgment in their favor.

As to the objections of plaintiffs to the entry of the orders of May 3, 1976, the court is of the opinion that the objections are without merit and should be overruled.

On their brief in support of their motion for summary judgment plaintiffs assert that "there are no genuine issues of material fact either as to the entire case or any one or more propositions." Plaintiffs then state that "Beams were dealing with a Lion Oil Company that maintained its office and refinery at El Dorado with offices in the Lion Oil Building."

In view of the contention of plaintiffs the court believes it should first consider the motion of Lion and determine whether plaintiffs from September 30, 1955, to September 29, 1972, did any business with the defendant Lion.

The undisputed facts disclose that prior to September 30, 1955, Lion was a Delaware corporation with its principal operating offices at El Dorado, Arkansas, and was engaged in the exploration and production of crude oil and natural gas, the refining of crude oil and the marketing of refined pe-

troleum products and the operation of plants for the production of nitrogenous fertilizer materials; that on September 30, 1955, Lion was under the laws of Delaware merged with and into Monsanto, a Delaware corporation, and ceased to exist as a separate corporate entity on that date; that Monsanto acquired title to all of the assets of Lion and became liable for all the obligations of such corporation by operation of law when such merger was completed.

That Monsanto Chemical Company amended its Certificate of Incorporation and changed its name to Monsanto Company on or about April 15, 1965.

That Monsanto first operated a portion of the facilities of the former Lion Oil Company under the designation of Lion Oil Company Division of Monsanto. It transferred the operations of the nitrogenous fertilizer facilities to a different division of Monsanto and made other organizational changes with respect to all the assets acquired by virtue of such merger; that on or about July 1, 1961, Monsanto ceased the designation of any part of its business as a Division of Lion. On that date the facility that had been so designated became a part of the Hydrocarbons Division of Monsanto and there evolved a method of operations whereby all of the operations for the production of crude oil and natural gas were conducted directly under the name of Monsanto.

That Monsanto made a management decision in the early part of 1972 to dispose of its petroleum refining and marketing facilities while still retaining its exploration and production operations; that negotiations were subsequently entered into between The Oil Shale Corporation and Monsanto for the purchase by The Oil Shale Corporation of Monsanto's El Dorado, Arkansas, oil refinery and related facilities pertaining to refining and marketing of refined petroleum products; that such negotiations culminated in an Agreement of July 5, 1972, whereby The Oil Shale Corporation agreed to purchase such assets and Monsanto agreed to sell such assets for approximately $25,000,000; that The Oil Shale Corporation assigned its rights under such Agreement of July 5, 1972, to a Delaware corporation, Tosco-Lion, Inc., and Tosco-Lion, Inc. and Monsanto closed the transaction on September 29, 1972, effective as of October 1, 1972.

In the agreement between Monsanto and The Oil Shale Corporation of July 5, 1972, Monsanto specifically assumed and remained wholly and entirely liable for all litigation, liabilities, obligations, duties, claims, losses, costs and expenses from events or occurrences resulting or arising in, under and with respect to such assets purchased from Monsanto, which events or occurrences resulted or arose prior to October 1, 1972, on account of the ownership, possession, use or operation of any of the property, assets and other rights sold, transferred or granted pursuant to said Agreement; that neither The Oil Shale Corporation nor its assignee, Tosco-Lion, Inc. (now this defendant), assumed any obligations in connection with any litigation, claims or matters arising therefrom with respect to any events that occurred prior to October 1, 1972.

W. A. Blase, Assistant Secretary of Monsanto, in an affidavit of October 1, 1974, said:

"That on September 30, 1955, Monsanto under its then name, Monsanto Chemical Company, merged into it Lion Oil Company (a corporation then duly organized and existing under and by virtue of the laws of the State of Delaware), thereby terminating the existence of said Lion Oil Company on said date. Monsanto was the surviving corporation of said merger and operated the business known as Lion Oil Company as an integral part of Monsanto and not as a separate corporation from September 30, 1955, to September 30, 1972, as of which latter date Monsanto sold the petroleum refining and marketing portions of said business (including all Monsanto's rights in the names, 'Lion' and 'Lion Oil', and its asphalt manufacturing business."

The claim of Lion is abundantly supported by affidavits and other documents on file. In order to clarify the status of

Tosco-Lion which was the assignee of The Oil Shale Corporation that purchased certain property from Monsanto, reference is made to the affidavit of J. H. Sheehan of March 4, 1976, who at that time was a Vice President and Director of Lion and has been such official since Tosco-Lion changed its name to Lion Oil Company by amendment to its certificate of incorporation on September 29, 1972, and after Tosco-Lion changed its name to Lion Oil Company, Monsanto assumed all of the obligations of The Oil Shale Company and the physical properties and assets covered by the agreement that Shale Oil had with Monsanto dated July 5, 1972. The affiant further states that there are no facts to support the allegations of plaintiffs in their second amendment to the complaint for the reason that Lion Oil did not even exist until July 26, 1972, and that neither Oil Shale nor Lion Oil has at any time assumed or agreed to assume any debt, responsibility, obligation or liability of Monsanto to the plaintiffs herein or either of them or to defend or assume the defense of any litigation on behalf of Monsanto.

In the affidavit of April 22, 1976, John B. Tweedy, Vice President of Lion, stated that on July 26, 1972, Tosco-Lion, a subsidiary of The Oil Shale Corporation, a Nevada corporation and the assignee of the sales agreement of July 5, 1972, between Monsanto and The Oil Shale Corporation, changed its name July 26, 1972, to Lion Oil Company, the present movant defendant herein as shown by its certificate of incorporation filed in the office of the Secretary of State of the State of Delaware.

That no officer or director of Monsanto has ever been an officer or director of The Oil Shale Corporation or Lion Oil Company; that no officer or director of The Oil Shale Corporation or Lion Oil Company has ever been a director of officer of Monsanto; that neither the Oil Shale Corporation nor the Lion Oil Company has ever entered into any transaction of any type, kind, character, or nature with the plaintiffs in this litigation or either of them.

That the public records in the State of Arkansas on file in the office of the Secretary of State reflect the merger of the former Lion Oil Company into Monsanto on September 30, 1955, and the termination of the existence of that corporation whose name was Lion Oil Company; that during the period from September 30, 1955, until September 29, 1972, there was no corporate entity doing business in the State of Arkansas by the name of Lion Oil Company.

H. Derrell Dickens, the general attorney for Lion Oil Company prior to September 30, 1955, and since October 1, 1972, under oath, stated:

"That on May 10, 1973, [prior to the filing of the second amendment to the complaint] the plaintiffs were notified that this defendant was in no way, shape or form connected with or involved in any transaction or controversy between the plaintiffs, or either of them, and Monsanto Company, as shown by a letter attached as Exhibit 'A' to the motion for summary judgment filed herein by this defendant; that this affiant, by telephone call to and conversation with Fines Batchelor, Jr., counsel for the plaintiffs, fully explained the transaction between Monsanto Company and this defendant pursuant to the Agreement of July 5, 1972, and suggested that he verify the nonexistence of this defendant prior to July 26, 1972, by either contacting the corporate division of the office of the Secretary of State of Arkansas or otherwise personally reviewing the pertinent documents on file in such division of that office; that this affiant offered to explain further and offer such other proof as may be reasonably requested by the plaintiffs to clearly show that this defendant was completely unrelated to this litigation, the transactions connected therewith and any other controversy between the plaintiffs and Monsanto Company; that the plaintiffs at no time requested any such verification of the facts and circumstances given to their counsel clearly showing that this defendant was not involved, directly or indirectly, in this litigation and the controversy covered

thereby; that the plaintiffs joined this defendant in this litigation without further investigation of any kind or character to the knowledge of this affiant."

Lion has consistently contended from the date of filing of the second amendment to the complaint against it, that the claims of plaintiffs cannot be sustained because it did not exist as a legal entity at any time it is alleged by plaintiffs that the claims arose.

John B. Tweedy, Vice President of Lion, under oath stated:

"That the original corporate name of this defendant was Tosco-Lion, Inc., and such corporation changed its corporate name to Lion Oil Company by amendment to its Certificate of Incorporation filed in the Office of the Secretary of State of Delaware on July 26, 1972; that The Oil Shale Corporation is now, and has been at all times since its incorporation, the owner of all of the issued and outstanding capital stock of this defendant; that neither this defendant, The Oil Shale Corporation, nor any subsidiary, affiliate, or associate of either this defendant or of The Oil Shale Corporation is a subsidiary, affiliate, or an associate of Monsanto Company, the other defendant to this cause of action and hereinafter herein referred to as 'Monsanto'; that neither Monsanto nor any subsidiary, affiliate, or associate of Monsanto controls, directly or indirectly, this defendant or The Oil Shale Corporation, and neither this defendant nor The Oil Shale Corporation (or any subsidiary, affiliate, or associate of either of them), controls, directly or indirectly, Monsanto or any subsidiary, affiliate, or associate of Monsanto; that there is no common control of Monsanto, The Oil Shale Corporation, or this defendant, directly or indirectly.

\*　　\*　　\*　　\*　　\*　　\*

"That he was in charge of all negotiations in behalf of The Oil Shale Corporation with Monsanto and knows that the matters stated herein are true and correct; that pursuant to said Agreement of July 5, 1972, Monsanto specifically assumed, and remained wholly and entirely liable for, all litigation, liabilities, obligations, duties, claims, losses, costs, and expenses, from events or occurrences resulting or arising prior to October 1, 1972, on account of the ownership, possession, use, or operation of any property, assets, and rights sold, transferred or granted to this defendant or the sale and delivery of any products related to the petroleum refining and marketing business so sold to this defendant."

It must be remembered that the original Lion Oil Company was incorporated under the laws of Delaware and likewise Monsanto was incorporated under the laws of Delaware, and the validity and effect of the merger is determined by the law of Delaware.

The second sentence of Rule 17(b), Fed.R. Civ.P., reads:

"The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized."

In *Sevits v. McKiernan-Terry Corporation,* (S.D.N.Y.1966) 264 F.Supp. 810, the court at page 811 held:

"Corporate existence and the capacity of a corporation to be sued are determined by the law of the state of incorporation. Fed.R.Civ.P. 17(b). See *Chicago T & T Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp.,* 302 U.S. 120, 58 S.Ct. 125, 82 L.Ed. 147 (1937); *Walder v. Paramount Publix Corp.,* 132 F.Supp. 912 (S.D.N.Y. 1955); *Newmark v. Abeel,* 102 F.Supp. 993 (S.D.N.Y.1952).

"Delaware law is the applicable law and under Delaware law it is settled that the separate corporate existence of a constituent corporation ceases upon merger and the emerging corporation is the only corporation with capacity to be sued and process cannot be served on the constituent corporation. Delaware Gen.Corp. Law § 259. See *Argenbright v. Phoenix Finance Co. of Iowa,* 21 Del.Ch. 288, 187 A. 124 (1936). See also *United States v. Borden Co.,* 28 F.Supp. 177 (N.D.Ill.) modified, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939). Therefore, the separate cor-

porate existence of Radcom ceased upon merger with Litton Systems, Inc."

In *Damon Alarm Corp. v. American District Telegraph Co.,* (S.D.N.Y.1969) 304 F.Supp. 83, the court at page 84 said:

"The Delaware law provides that when a merger becomes effective the separate existence of all corporations except the survivor shall cease to exist. 8 Del.C. § 259; *Sevits v. McKiernan-Terry Corp.,* 264 F.Supp. 810 (S.D.N.Y.1966); *Argenbright v. Phoenix Finance Co.,* 21 Del.Ch. 288, 187 A. 124 (1936). Consequently, the moving defendant no longer exists and the action cannot be maintained against it."

In *Basch v. Talley Industries, Inc.,* (S.D. N.Y.1971) 53 F.R.D. 9, the court at page 11 said:

"Capacity to sue depends on whether the person who is bringing suit has authority to use the courts of the jurisdiction in question. This is a problem of power and depends neither on the court involved nor on the cause of action asserted. Under Rule 17(b), Fed.R.Civ.P., 'The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized.'

"Until the time of the merger, GTC was a Delaware corporation. It was merged into Industries, also a Delaware corporation. The merger was effected pursuant to the laws of Delaware. Thus, Delaware law will determine the capacity of GTC to sue and the capacity of plaintiffs to sue derivately on GTC's behalf.

"The law of Delaware is quite clear on this point. Once a corporation has been merged out of existence, its rights, privileges and very identity are merged into the remaining corporation. 8 Del.C. § 259. By virtue of the merger, the merged corporation loses its capacity to sue the corporation into which it has been merged; * * *."

In *Chicago Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp.,* (1937) 302 U.S. 120, 58 S.Ct. 125, 127, 82 L.Ed. 147, the court said:

"The decisions of this court are all to the effect that a private corporation in this country can exist only under the express law of the state or sovereignty by which it was created. Its dissolution puts an end to its existence, the result of which may be likened to the death of a natural person."

See, also, 6 Wright and Miller, Federal Practice and Procedure, Civil, § 1563; *Johnson v. Rac Corp.,* (4 Cir.1974) 491 F.2d 510, and Note 3 with citation of authorities on page 511.

The plaintiffs do not by affidavit controvert the affidavits and record before the court, but on their brief they contend that they dealt with B. R. Smith, J. H. Sheehan, N. P. Hudson and others in the Lion Oil Building. The persons named were employed by Monsanto. Plaintiffs could not have thought they dealt with Lion. They did not make any claim against Lion until the second amendment to the complaint was filed on March 22, 1974, two years, three months and sixteen days after the first complaint was filed against Monsanto.

The persons named by plaintiffs with whom they dealt submitted affidavits in connection with the motion of Monsanto for summary judgment, and all stated they were employees of Monsanto.

Under the facts and law the defendant Lion did not exist and, of course, is not liable to plaintiffs nor subject to suit for anything that occurred from September 30, 1955, to September 29, 1972, and the motion of defendant Lion for summary judgment should be sustained and the second amendment to the complaint dismissed, and the motion of plaintiffs for summary judgment against Lion denied and overruled.

### *The Joint Motions of Monsanto and Plaintiffs for Summary Judgment*

In the motion Monsanto alleged (1) that the court has no jurisdiction over the subject matter of the cause; that no genuine issue of any material fact exists and it is entitled to a dismissal of the complaint and amendments thereto, (2) and that it seeks summary judgment on each issue involved

in the action severally, so that if the entire action is not disposed of on the motion, only those issues will be further litigated.

To sustain its motion Monsanto relies upon and filed the following:

"a. The plaintiffs' answers to interrogatories propounded by Lion Oil Co.

b. Depositions of plaintiffs taken January 28, 1972.

c. Affidavits of J. H. Sheehan and N. P. Hudson, then manager of asphalt sales for Monsanto Company, and W. A. Blase, Assistant Secretary of Monsanto Company.

d. Monsanto's response to Requested Admissions of Fact and Answers to two sets of Interrogatories.

e. All relevant pleadings of the parties."

The plaintiffs oppose the motions of Monsanto and Lion and have filed their motion for summary judgment, and as heretofore set forth by the court have alleged in their response to the motion of Monsanto "there is no genuine issue of any material fact with reference to any of the alleged issues and plaintiffs are entitled to summary judgment as a matter of law as to each of the following points. They then enumerate fifty-two points relied upon in support of their contention and against the contentions of both Monsanto and Lion, and pray for a joint and several judgment for $2,295,000 and attorney's fee and costs.

In support of this response and motion for summary judgment herein, the plaintiffs rely upon the following:

1. Their complaint herein.

2. Each amendment to their original complaint herein filed.

3. Affidavits of plaintiffs dated May 26, 1976.

4. Responses of Lion Oil and Monsanto Companies to interrogatories propounded by plaintiffs.

5. Responses by Monsanto Company and Lion Oil Company to request for admission of facts.

6. Monsanto Company's response to motion to compel response to interrogatories.

7. All pleadings, affidavits, responses, and other matters including the entire file herein.

Without unduly extending this opinion, the court will summarize the material facts as established by the record, depositions, and the affidavits submitted by all the parties relative to the claims of plaintiffs against Monsanto. It is difficult to separate the "wheat from the chaff" as indicated by a statement made in plaintiffs' brief where they state:

" * * * that a jury could well find that the present Lion Oil, if truly a separate entity from Monsanto, has conspired with Monsanto to destroy records and conceal its anti-trust violations."

This statement illustrates the lack of substance in most of the statements of plaintiffs and in all of their contentions when the established facts are considered.

As a matter of fact, plaintiffs knew that they were buying from Monsanto. They had no dealing with Lion. They were in possession of the facts as evidenced by the allegations of the complaint and the first amendment thereto.

Defendant Monsanto is not and never has been affiliated or connected with the other defendant in this case and has never had any ownership interest in such corporation, either direct or indirect, and has not at any time had any right of control over the corporation now known as defendant Lion Oil Company. (Affidavit of W. A. Blase, dated October 1, 1974.)

Plaintiffs Jim and Bill Beam, as partners, doing business in the State of Arkansas under the name Beam Brothers Contractors, made and sold asphaltic concrete, a substance used as "blacktop" for streets, roads and driveways during the period 1965 through 1969. (Plaintiffs' response to interrogatories, No. 5.) Plaintiffs entered this business by purchasing an asphalt or "hot-mix" plant in late 1964 which was put into operation in April or May 1965. (Plaintiffs' response to interrogatories, No. 5, and

deposition of Jim Beam, pp. 18, and 143–4.) Plaintiffs' asphaltic concrete business was terminated in December of 1969. (Deposition of Jim Beam, p. 6.)

Plaintiffs' asphaltic concrete business resulted primarily from bids for contracts for the construction, reconstruction, repair and/or resurfacing of highways in the State of Arkansas. (Plaintiffs' response to interrogatories, No. 13, and Par. IV of the second amended complaint.) Eighty percent of the plaintiffs' business was with the Arkansas Highway Department. (Deposition of Jim Beam, p. 23.) The balance of plaintiffs' business consisted of parking lots, service stations, driveways and other "small jobs" in the vicinity of plaintiffs' hot-mix plant in the State of Arkansas. (Deposition of Jim Beam, pp. 117–118.) All of the asphalt material plaintiffs purchased from Monsanto Company was used within the State of Arkansas. (Deposition of Jim Beam, pp. 157–158.)

Plaintiffs frequently bid on more work than they could handle, knowing that work orders would not be issued by the State until the contractor was ready and that this sometimes took up to a year. (Deposition of Jim Beam, pp. 39 and 125.) Uniform price offers were received from the asphalt suppliers prior to each bid, and the price offered was always honored at the later date when the work was actually performed, pursuant to a "gentlemen's agreement." (Deposition of Jim Beam, pp. 87–91 and 95.) Each contractor and each supplier received notice of each opportunity to bid from the Arkansas Highway Department. Asphalt suppliers, including Monsanto Company, mailed price quotations to each contractor, including plaintiffs, prior to each bid. (Deposition of Jim Beam, pp. 48–49.)

All of the plaintiffs' competitors were located in Arkansas, including Madden Contracting Company of Louisiana which moved a hot-mix plant to a location alongside the plaintiffs' plant in Prescott, Arkansas. (Plaintiffs' response to interrogatories, No. 11(o) and deposition of Jim Beam, p. 107.)

Jim Beam testified in his deposition that competitors of Lion Oil Company were Barry, Cross, McMillian, Humble Oil out of Memphis, and Calumet out of Shreveport (dp. 82).

"Q. And when you received a quote there, it was generally oral. Is that right?

A. Yes. * * *

Q. * * * When you were the successful bidder, did you always buy from the person that gave you the quote that you relied on?

A. If they gave me the lowest quotation, I always bought from them. (dp. 89) * * *

Q. Did you notice a variance in asphalt prices from job to job?

A. Well, yes, your freight would affect it. (dp 91) * * *

Q. You say Lion Oil Company extended you more credit than any other asphalt supplier did?

A. Yes. I never did buy anywhere near the volume from anybody else that I bought from Lion Oil Company. (dp. 92) * * *

A. Well, Monsanto never under cut Barry's price and Barry never under cut Monsanto's price. They always said they had a freight adjustment.

Q. * * * and the freight adjustment being from the point where it is delivered to your hotmix plant.

A. Well, I never really understood it. The further you were away from the plant the cheaper it was.

Q. Do you think that it was an effort of each of them to meet a price at your plant of each other?

A. Yes, I would say that was what it was. (dp. 93) * * *

Q. Well now, if they have the same basis in this price discrimination in both Federal and State Court, and I understand your answer to be that right now it's based upon two invoices that you have in your possession that you saw at Arkansas Rock and Gravel in 1970, regarding material furnished to Arkansas Rock and

Gravel sometime in 1969, and at the same time that you were being sold the same material for $17.00 that was sold to Arkansas Rock and Gravel for $16.00. Is that right?

A. Yes.

Q. Now to your knowledge, is there any other factual (dp. 116) basis for your complaint against Monsanto on price discrimination?

A. I just don't know. I don't know what all the laws would be. (dp. 117)

* * *

Q. Did you do any of these small jobs outside the State of Arkansas?

A. No. (dp. 118)

Q. Do I understand your testimony to be that all of the asphalt that you purchased from Lion Oil at El Dorado during the years 1966, '67, '68, '69 was utilized within the State of Arkansas?

A. Yes. (dp. 157–158)

Q. Did you ever find anybody bidding on the same job that they quoted the price lower (to) than they did to you on that particular job, and that particular day, and that particular location?

A. No. (dp. 160)

Q. Did you ever advise Monsanto that you had, or could buy asphalt at a price lower than they were offering it to you?

A. When we were at Mena, I am sure that I told Bob Smith the reason I bought from Barry was because I got a cheaper price.

Q. Did he offer to meet it?

A. Apparently, he didn't; I bought from Barry. (dp 160–166)

Q. Did you ever ask Bob Smith what he was quoting other people? Did you ever ask whether he was quoting asphalt for more or less to you than he was to other people?

A. I asked Bob if I was getting as good a price as he was giving anyone. And because of the reflection in bids, I have accused him more or less in a joking type of way, of selling some-

body else for less money than he was selling it to me, and he assured me that he wasn't doing this.

Q. And you don't have any evidence today that he was lying, do you? On a job basis at the time.

A. No. (dp. 164–165)"

N. P. Hudson who was manager of asphalt sales for Monsanto Company, doing business as Lion Oil Division of Monsanto, "during the period 1964 through 1969" stated on oath that "Monsanto Company's business was on a job-by-job basis and all purchases of the asphalt from Monsanto Company were f. o. b. El Dorado, Arkansas. All asphalt sold by Monsanto to the plaintiffs was produced and refined in Arkansas." He stated that "in no case was one bidder on a particular job given a different price for the product for that job than any other bidder"; and that "I know of my own personal knowledge that Monsanto Company did not give any competitor of the plaintiffs a better or lower price for asphaltic products of like kind and quality on any job in which the plaintiffs were interested than it did the plaintiffs."

In the affidavit of Bob R. Smith, the only sales representative for paving asphalt for Monsanto in the State of Arkansas during the entire period of the Beam Brothers' purchase of asphalt from the Lion Oil Division of Monsanto, he stated under oath that "during the entire period of time, I always quoted every interested person with whom I had any contact the exact same price for asphalt to be utilized on a particular paving project or job," that "the quoted price would often vary from project to project on the same job letting day for the primary purpose of meeting Monsanto's competition in asphalt sales in the State of Arkansas." He explains that, "Other factors affecting the quoted price on a project or job basis included the amount of asphalt in storage at the El Dorado plant and the volume of asphalt to be utilized on each individual job, as well as other economic factors." He also stated that he knows "that Monsanto Company quoted to the Beam Brothers and to every other interested bidder," [including

Madden Construction Company] "on each individually numbered project or job being let by public authority in the State of Arkansas, the exact same price for product of like kind and quality throughout the entire period of Monsanto's dealings with the Beam Brothers. He further explains that once the Lion Oil division agreed with a contractor to deliver the paving products from its El Dorado office for a particular job, the quoted price remained the same for that particular job regardless of the number of months or sometimes years that it took to complete the job.

The asphaltic concrete business involved in this case is local in nature. The second amended complaint, first amended complaint, as well as the original complaint in this case fail to allege any facts to support plaintiffs' claims.

Section 2(a) of the Robinson-Patman Act states:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, *where either or any of the purchases involved in such discrimination are in commerce,* where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and *where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce,* or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: * * *." 15 U.S.C.A., Section 13(a). (Emphasis added.)

In *Willard Dairy Corp. v. National Dairy Products Corp.,* (6 Cir.1962) 309 F.2d 943, the court sustained the motion of National Dairy Products Corporation, defendant, for summary judgment in its favor without opinion. On appeal by plaintiff the court, beginning on page 945 said:

"The Act applies to discrimination between different purchasers of commodities of like grade and quality, and holds the seller, in such a case, liable. * * * The Act has been construed as giving a right of action to a competitor of the seller who is injured in his business thereby as well as to a customer who has been discriminated against. (Citations omitted.) However, by the express terms of the statute it is essential to establish a violation that the sale complained of be by a person 'engaged in commerce, in the course of such commerce.' * * *

"In the present case there is no question but that the defendant was engaged in commerce, but it is contended that the discriminating sales complained of were not made 'in the course of such commerce' and therefore were not in violation of the Act. The authorities appear to hold that it is not enough under the Clayton Act, as amended by the Robinson-Patman Act, that the defendant be engaged in interstate commerce but it must also be shown that the sale complained of was one occurring in interstate commerce. (Citations omitted.) * * *

"The cases recognize a distinction between the commerce which is covered by the Sherman Act and that covered by the Robinson-Patman Act. 'In an action brought under the Robinson-Patman Act it is necessary to allege and prove that the transactions complained of are actually in interstate commerce, while in actions brought under the Sherman Anti-Trust Act it is sufficient if the transactions complained of are shown to have affected interstate commerce.' (Citations omitted.) Accordingly, cases involving liability under the Sherman Anti-Trust Act where it was sufficient to show that the sales *affected* interstate commerce are not applicable to our present case.

"In the present case, the price discrimination relied upon was by reason of sales in the area of competition and sales in and around the City of Marion, Ohio. These sales by the defendant were from

defendant's processing plant in Shelby, Ohio, and were purely intrastate transactions, not interstate in character, as is necessary to impose liability under the Robinson-Patman Act. The fact that defendant also made interstate shipments from other than its Shelby, Ohio, plant to areas in which the plaintiff did not engage in business is immaterial to the issue in this case." (Citations omitted.)

The Willard case was followed in *Bowen v. New York News, Inc.*, (S.D.N.Y.1973) 366 F.Supp. 651. See pages 680, 681.

In *Mayer Paving and Asphalt Co. v. General Dynamics Corp.*, 486 F.2d 763 (7 Cir. 1973), cert. denied 414 U.S. 1146, 94 S.Ct. 899, 39 L.Ed.2d 102 (1973), rehearing denied 417 U.S. 978, 94 S.Ct. 3189, 41 L.Ed.2d 1149 (1974), the court in discussing Section 2(a) of the Clayton Act, at page 766, said:

"Section 2(a) of the Clayton Act, as amended, requires three different types of 'in commerce' (i. e., interstate commerce) tests to be satisfied before jurisdiction can be established: first, the discriminator must be 'in commerce'; second, the challenged discrimination must occur 'in the course of such commerce'; and third, 'either or any of the purchases involved in such discrimination are in commerce * * *.'

'The first two elements of the statutory "commerce" provision are of lesser import * * *. Of prime decisional significance * * * is the test that the challenged discriminatory transaction must itself occur "in" commerce. Under that test, the applicability of Robinson-Patman is determined by this rule of thumb; at least one of the two transactions which, when compared, generate a discrimination must cross a state line.' Rowe, Price Discrimination Under the Robinson-Patman Act (1962), § 4.9, at 78–79."

■ The undisputed facts are that the plaintiffs were purchasing and using products produced and purchased in Arkansas. All of their competitors in similar transactions with Monsanto purchased Arkansas products from Monsanto for use in Arkan-

sas paving. Monsanto was, of course, engaged "in commerce," selling asphalt and other goods in interstate commerce. But that merely satisfies one element of the commerce requirement in a Robinson-Patman case. No out-of-state sale by Monsanto for use in another state, where the Beam Brothers were not in business, could possibly have been involved in a comparable discriminatory transaction or injured plaintiffs in their purely local Arkansas paving business. The second and third elements of the commerce test in this secondary line discrimination case cannot be satisfied.

■ The "well established" distinction between primary and secondary line injury applied in the *Mayer* case should be applied in this case involving only secondary line injury and the "in commerce" requirement of the Robinson-Patman Act. "The customer has standing only to raise and compare those sales which are injurious to his competition." *Mayer,* supra, at p. 770. The plaintiffs point to sales, for example to Madden Construction Company of Minden, Louisiana, some for delivery in Arkansas and some for delivery in Louisiana. Madden Construction Company installed a hot-mix plant adjacent to the plaintiffs' plant at Prescott, Arkansas, and competed with them and others for Arkansas State Highway projects using Arkansas materials on Arkansas roads. During the same period of time, Madden Construction appears to have purchased asphalt from the El Dorado plant for use in Louisiana on entirely different projects in which the plaintiffs had no interest. These interstate sales to Madden Construction for use in Louisiana did not involve competition with plaintiffs and are not comparable to transactions under the Robinson-Patman Act.

■ The plaintiffs' seem to argue that their intrastate transactions with the El Dorado plant, or comparable transactions, had an effect on interstate commerce, e. g., the interstate purchase of crude by Monsanto, or the use of the U.S. mails by Monsanto's credit department at St. Louis to give instructions to its Lion Oil division. The recent Supreme Court decision in *Gulf Oil*

*Corp.*, 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974) disposes of any such "nominal" effects on commerce argument in this case:

"In short, assuming arguendo that the facially narrow language of the Clayton and Robinson-Patman Acts was intended to denote something more than the relatively restrictive flow of commerce concept, we think the nexus approach would be an irrational way to proceed. The justification for an expansive interpretation of the 'in commerce' language, if such an interpretation is viable at all, must rest on a congressional intent that the Acts reach all practices, even those of local character, harmful to the national marketplace. This justification, however, would require courts to look to practical consequences, not to apparent and perhaps nominal connections between commerce and activities that may have no significant economic effect on interstate markets. We hold, therefore, that Sully-Miller's and Industrial's sales to interstate highway contractors are not sales 'in commerce' as a matter of law within the jurisdictional ambit of Robinson-Patman § 2(a) and Clayton §§ 3 and 7.

"Our rejection of the 'nexus to commerce' theory requires that the Ninth Circuit's judgment be reversed. Copp also advances, somewhat obliquely, a second theory to support that judgment. It contends that, despite the facially narrow 'in commerce' language of the Robinson-Patman and Clayton Act provisions, Congress intended those provisions to manifest the full degree of its commerce power. Therefore, it is argued, the language should not be limited to the flow of commerce concept defined by this and other courts, but rather should be held to extend, as does § 1 of the Sherman Act, to all persons and activities that have a substantial effect on interstate commerce. We find this theory equally unavailing on the record here.

"As to § 2(a) of the Robinson-Patman Act at least, the extraordinarily complex legislative history fails to support Copp's argument. When the Patman bill was passed by the House, it contained, in addition to the present narrow language of § 2(a), the following provision:

" 'It shall also be unlawful for any person, whether in commerce or not, either directly or indirectly, to discriminate in price between different purchasers * * * where such discrimination may substantially lessen competition * * *'

"The Conference Committee, however, deleted this 'effects on commerce' provision, leaving only the 'in commerce' language of § 2(a). Whether Congress took this action because it wanted to reach only price discrimination in interstate markets or because of its then understanding of the reach of the commerce power, its action strongly militates against a judgment that Congress intended a result that it expressly declined to enact. Moreover, even if the legislative history were ambiguous, the courts in nearly four decades of litigation have interpreted the statute in a manner directly contrary to an 'effects on commerce' approach. With almost perfect consistency, the circuit courts have read the language requiring that 'either or any of the purchases involved in such discrimination [be] in commerce' to mean that § 2(a) applies only where 'at least one of the two transactions which, when compared, generate a discrimination * * * cross a state line.' In the face of this long standing interpretation and the continued congressional silence, the legislative history does not warrant our extending § 2(a) beyond its clear language to reach a multitude of local activities that hitherto have been left to state and local regulation. See *Bunte Brothers, supra.*" 95 S.Ct. 392, 400, 42 L.Ed.2d 378, 388–390.

### No Unlawful Price Discrimination Occurred Because the Same Prices were Offered to Plaintiffs and Their Competitors

In *Gulf Oil Corp. v. Copp Paving Co.,* supra, at the beginning of the opinion the Supreme Court described the local character of the asphaltic concrete business in the following words:

"Asphaltic concrete is a product used to surface roads and highways. It is manufactured at 'hot plants' by combining, at temperatures of approximately 375 ° F, about 5% liquid petroleum asphalt with about 95% aggregates and fillers. The substance is delivered by truck to construction sites, where it is placed at temperatures of about 275 ° F. Because it must be hot when placed and because of its great weight and relatively low value, asphaltic concrete can be sold and delivered profitably only within a radius of 35 miles or so from the hot plant."

Plaintiffs' asphaltic concrete business resulted primarily from bids for contracts for the construction, reconstruction, repair and/or resurfacing of highways in the State of Arkansas. (Plaintiffs' response to interrogatories, No. 13, and Par. IV of the second amended complaint.) Eighty percent of the plaintiffs' business was with the Arkansas Highway Department. (Deposition of Jim Beam, p. 23.) Plaintiffs used a radius of probably 50–60 miles from their hot-mix plant at Prescott as a bidding area. (Deposition of Jim Beam, p. 42.) It is only competition involving the plaintiffs that is in dispute in this case:

"We are fortified in this conclusion by the fact that § 2(a) specifies that a price discrimination is actionable only 'where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them  *  *  *.' Only those purchases which might injure competition are 'involved' under the Robinson-Patman Act." (*Mayer Paving v. General Dynamics,* supra, at p. 769.)

In *M. C. Manufacturing Co., Inc., v. Texas Foundries, Inc.,* (5 Cir.1975) 517 F.2d 1059, the court at page 1066 said:

"Discriminatory pricing is violative of Robinson-Patman only when it lessens or tends to prevent competition between customers or between sellers. To consti-tute a Robinson-Patman wrong, the price discrimination must occur between competitors in comparable transactions—i. e., where persons receiving the different prices are in actual, functional competition with one another—and it must have the requisite effect upon actual or potential competition. Even if the sales at different prices are contemporaneous, involve goods of like grade and quality, the price distinction is not justified by good business cause, and it causes injury to the disadvantaged purchaser, recovery under the Act is precluded absent proof that the price variance detrimentally affected competition.

"Competition between the buyers at disparate prices is essential to a violation of the Robinson-Patman Act, see *Ag-Chem Equipment Co., Inc. v. Hahn, Inc.,* 480 F.2d 482, 490–91 (8th Cir.1973), and the existence of this requisite is normally a fact question to be determined by making a realistic appraisal of all the relevant facts."

The established policy of Monsanto during the period 1965 through 1969 was to offer asphalt to be utilized on a particular paving project or job to all interested persons, including plaintiffs, at the exact same price.

 It is true that the quoted price would often vary from project to project on the same job-letting day for the primary purpose of meeting Monsanto's competition. The meeting competition justification for price differences appears in Section 2(b) of the Robinson-Patman Act:

"Provided, however, That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor." 49 Stat. 1526 (1936), 15 U.S.C. Section 13(b) (1964).

There were, of course, many other conditions, as stated by affidavit of B. R. Smith,

heretofore referred to, affecting the quoted price on a project or job basis.

■ While there is little case authority for this changing conditions defense, the reason is obvious. It is fundamental that the antitrust laws promote price competition in response to changing conditions, not price rigidity. Common sense as well as good competition requires that prices change when conditions change in the marketplace. It is fair to say that price changes with resulting price difference are sine qua non of healthy market conditions and proper business behavior by sellers. It is sameness of prices that should be suspect, not price differences due to changed conditions.

■ For the purpose of summary judgment, defendant Monsanto Company relies upon the functional availability defense. The same products were in fact available to the plaintiffs on every project at the same price as the products were available to others. Under these facts, there can be no "injury to competition" and no unlawful discrimination in the purchases by plaintiffs and their competitors from Monsanto. The case of *Tri-Valley Packing Asso. v. Federal Trade Commission,* (9 Cir.1964) 329 F.2d 694, while involving an agency proceeding rather than private litigation, is instructive on the principles which should be applied here.

*Plaintiffs have not Established Any Facts Which Show an "Injury" as a Result of an Antitrust Violation*

■ The Robinson-Patman Act creates no right of action in private parties. It is solely under Section 4 of the Clayton Act that the plaintiffs can claim any right to sue for a violation of the Robinson-Patman Act. The law is clear that they must prove that they were injured as a direct result of the unlawful conduct of Monsanto:

"SEC. 4. That any person who shall be *injured* in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States * * *." [emphasis supplied] 15 U.S.C. § 15.

■ Plaintiffs allege that as a result of claimed unlawful price discrimination by Monsanto, they were seriously damaged "by reason of direct overcharges for materials purchased * * *" and that they were "forced out of business" with consequent "loss of all their equipment and real estate * * *, good will, * * * large judgments being obtained against them for merchandise and supplies purchased by them, * * * etc." (Second amended complaint, Par. IX). These allegations, of course, tell us little. Plaintiffs must state facts which show that the alleged antitrust violation was a "material cause" or "a substantial factor" in the occurrence of the claimed injury. *Billy Baxter, Inc. v. Coca-Cola Co.,* 431 F.2d 183, 187 (2d Cir.1970), cert. den., 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). The plaintiffs have not done this.

■ What the plaintiffs have done is to make a clear admission that they have no facts to support their injury claim. The "two instances" of f. o. b. invoice price differences to Arkansas Rock and Gravel showing lower f. o. b. prices than similar f. o. b. invoice prices to Beam Brothers are not evidence of injury. Monsanto agrees that there are numerous, perhaps thousands of invoices in its files which show different f. o. b. prices paid for the same product at about the same time. Here, the plaintiffs were offered the same product for the same price for delivery to the same job on the contract letting day as it was offered to Arkansas Rock and Gravel. Necessarily, only one contractor, the successful bidder, is actually invoiced for asphaltic products delivered for use on a particular paving job at a particular location. See affidavits of N. P. Hudson and B. R. Smith. These invoice price differences are not only not evidence of injury to anyone, they are not even suggestive of any unlawful activity.

■ This is true for a number of reasons, the plainest and simplest being that the Robinson-Pateman Act is concerned with reasonably contemporaneous competitive transactions, not f. o. b. price shown at time of invoicing. In the asphaltic concrete

business it is not uncommon that projects or jobs take months or even years to complete. There is nothing in the law that prohibits different prices at different times. There is nothing in the law that prohibits different prices in noncompetitive geographic areas, or with respect to noncompetitive projects or jobs, or merely because differing supply conditions suggest to the seller that the market will bear a higher or lower price at one time or another. All of these circumstances and others could and did result in different invoice prices on the same day for the same product, without "injury" to anyone. Plaintiffs appear to fail to understand the very limited information revealed by any invoice price for anti-trust purposes.

Nothing more need be said about plaintiffs' claimed showing of "injury" from f. o. b. invoice price differences than that their conclusion that they were "forced out of business" as a result is no more than a mere conclusion unsupported by facts.

Section 15b, 15 U.S.C., is as follows:

"Any action to enforce any cause of action under sections 15 or 15(a) [of this title] shall be forever barred unless commenced within four years after the cause of action accrued * * *." October 15, 1914, c. 323, Section 4B, as added July 7, 1955, c. 283, Section 1, 69 Stat. 283.

■ It is apparent that at least a portion of the plaintiffs' claim is barred by the statute of limitations. Since the burden of proof for showing damages is on plaintiff, it is their duty to come forward and show how much asphalt was bought in unlawful discriminatory transactions after December of 1967, within four years prior to filing of suit against Monsanto on December 6, 1971, and four years prior to filing of suit against Lion on March 22, 1974.

The undisputed facts are that plaintiffs were engaged in competition in a business that is peculiarly local in nature. The law requires that only the purchases by plaintiffs' competitors and by plaintiffs be considered in determining whether "either or any" discriminatory sale is "in commerce." A nominal effect on commerce is not enough. The undisputed facts are that their competitors, like plaintiffs, made purchases from Monsanto to the extent relevant here, from the El Dorado refinery—in Arkansas—of asphalt produced and marketed in Arkansas, delivered in Arkansas, and used exclusively on Arkansas land, principally as blacktop for Arkansas state highways. This is a classical intrastate commerce case. Furthermore, the plaintiffs have made no showing of a price difference that is unlawful price discrimination or of any "injury" resulting from unlawful price discrimination. Plaintiffs were offered and had the opportunity to purchase the defendant's paving products for use on each particular job at exactly the same price as their competitors. They did not avail themselves of the same price on every job because they were not the successful bidder on those jobs where the asphaltic products were in fact invoiced to others. Likewise, neither did their competitors avail themselves of the same price offered on the jobs for which plaintiffs were the successful bidder. Not only is there an absence of unlawful price discrimination, the fact of availability of the same products to the plaintiffs and to their competitors at the exact same price destroys any causal connection between the alleged price discrimination and their claimed injury.

Therefore, under the facts as disclosed by the pleadings, depositions, answers to interrogatories, admissions and affidavits based upon personal knowledge of the affiants, the provisions of sections (b), (c) and (e) of Rule 56, Fed.R.Civ.P., as uniformly construed by the court in *Marion County Co-Op Ass'n v. Carnation Co.,* (W.D.Ark.1953) 114 F.Supp. 58, aff'd 214 F.2d 557; *Chambers v. United States,* (8 Cir.1966) 357 F.2d 224; *Kern v. Tri-State Ins. Co.,* (8 Cir.1967) 386 F.2d 754; *Solomon v. Houston Corrugated Box Co., Inc.,* (5 Cir.1976) 526 F.2d 389, note especially Sec. 6, p. 395; the motion for summary judgment of defendant Monsanto Company should be sustained on all issues and the motion of plaintiffs, Jim and Bill Beam, should be overruled and denied and the complaint dismissed.